after Mullins's advice and before Tiffany's death demonstrate the wrongness of Mullins's advice – Mullins recommended a course of action that took over four days to effectuate after Sheets told him that Montgomery threatened to kill her and her children.

In sum, I disagree with the majority's position because I believe that Mullins is liable as long as his affirmative act continued to increase Tiffany's exposure to harm. Here, Sheets relied on Mullins's advice until Tiffany's death. Sheets never engaged in self-help and she instead sought a custody order, which took four days to obtain. As long as Sheets relied on Mullins's advice (given while he had a conflict of interest) by choosing the court-custody route and forgoing self-help, Mullins was liable for the increased risk of danger that Tiffany experienced.

**Interlocutory Analysis Of The Second Qualified Immunity Requirement: Whether An Objectively Reasonable Officer Would Recognize That Mullins's Conduct Violated Substantive Due Process Rights.**

The second point of analysis is whether a public official's conduct violated clearly established federal rights. I agree with the majority in concluding that no source of law has adequately informed police officers that they may be liable for advice that they give while operating under a conflict of interest. I believe that under these conditions – where a police officer responds to a question from a domestic abuse victim – a reasonable police officer would not realize that if he acted with a conflict of interest and if his actions increased a person's exposure to harm, those actions violated the person's substantive due process rights. Thus, even though I believe that Sheets sets forth a *prima facie* case of Mullins's liability for a substantive due process violation, Mullins is still entitled to qualified immunity because the right he violated was not clearly established. For that reason, I concur with the result that the majority reaches.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0144P (6th Cir.)
File Name:  02a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THERESA SHEETS; THERESA SHEETS, as the Administrator for the Estate of Tiffany Jean Montgomery, Deceased,
    *Plaintiffs-Appellees,*

    *v.*

SERGEANT HOWARD MULLINS,
    *Defendant-Appellant.*

No. 00-4162

Appeal from the United States District Court for the Southern District of Ohio at Columbus. No. 98-00170—Edmund A. Sargus, Jr., District Judge.

Argued:  October 30, 2001

Decided and Filed:  April 25, 2002

Before:  SILER and COLE, Circuit Judges; STAFFORD, District Judge.[*]

_____

[*] The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

_____

**COUNSEL**

**ARGUED:** Mark D. Landes, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellant.   James D. McNamara, Columbus, Ohio, for Appellees.  **ON BRIEF:** Mark D. Landes, Douglas C. Boatright, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellant. James D. McNamara, Columbus, Ohio, for Appellees.

STAFFORD, D. J., delivered the opinion of the court, in which SILER, J., joined. COLE, J. (pp. 16-20), delivered a separate opinion concurring in the conclusion.

_____

**OPINION**

_____

STAFFORD, District Judge.  Appellant, Sergeant Howard Mullins ("Mullins"), appeals the district court's decision denying his motion for summary judgment on the basis of qualified immunity.  We reverse.

### I.  BACKGROUND

Theresa Sheets ("Sheets") and Roger Montgomery ("Montgomery") lived together in Gallia County, Ohio, with their baby daughter, Tiffany, and Sheets's son, Shawn.  On Thursday, February 20, 1997, Montgomery shot and killed Tiffany, set fire to his residence, then shot and killed himself.

According to Sheets, the tragic events of February 20th were the result of an incident that occurred four days earlier, on Sunday, February 16, 1997.  That Sunday morning, Montgomery threatened Sheets by putting a knife to her side, then pulling a gun on her.  At the time, neither Tiffany--who was spending the weekend with Shirley Lilly, Montgomery's sister--nor Shawn was at home.  Montgomery's conduct caused Sheets to pack her clothes and leave the residence with

First, the majority opinion drifts into a factual analysis when it decided that Mullins's conduct was too remote.  The remoteness determination involves questions of foreseeability and proximate cause and both of those questions are generally determined by the finder of fact.  *See Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 792 (6th Cir. 1984) ("Ultimately, the determination whether an independent and intervening act is sufficient to cut off the chain of causation is a factual issue."); *see also Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 127 (2d Cir. 1996) ("Questions regarding what is normal or foreseeable, like other questions of proximate cause, are generally issues for the trier of fact."). This Court does not have jurisdiction on interlocutory appeal to weigh the facts of Sheets's case.  Rather, this Court is confined to a narrow review of issues of law.  The issue of law that may be reviewed here is whether Sheets sets forth a *prima facie* case of a violation of substantive due process. This Court should not expand that review to decide the broader question of whether Mullins did in fact proximately cause an injury, as the majority opinion does.

Second, even if proximate cause were a legal issue and reviewable on interlocutory appeal, I disagree with the majority opinion's legal analysis.  Acts of third parties are not considered superseding acts if they are foreseeable.  *See Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996) ("If an act that intervenes between the defendant's conduct and the plaintiff's injury is not reasonably foreseeable, this intervening act is the independent cause of the injury, and it breaks the causal chain that would establish the defendant's liability."); RESTATEMENT (SECOND) OF TORTS § 443, at 472 & § 448 cmt. c, at 482.  Each act that the majority opinion identifies could reasonably be viewed as a foreseeable consequence of Sheets following Mullins's advice – each relates to Sheets pursuing a custody order and not resorting to self-help.  Because each act could be viewed as foreseeable, those acts cannot, as a matter of law,  prevent Mullins from being liable for Tiffany's increased exposure to harm. Moreover, I have trouble subscribing to the majority's remoteness reasoning because the several events occurring

calling another officer who was not under a conflict of interest, Mullins advised Sheets not to retrieve Tiffany through self-help, but rather to obtain custody of Tiffany through the court system. Because Mullins had a conflict of interest and still advised Sheets, his conduct rises to the level of an affirmative act that may form the basis for § 1983 substantive due process liability.

On less extreme facts, I would be less inclined to reach this result. To promote friendlier community policing, a police officer's advice in response to a person's inquiry of how to best obtain custody of her child should not generally rise to the level of an affirmative act for purposes of § 1983 substantive due process liability. Moreover, a police officer with a conflict of interest does not violate substantive due process rights by responding to a report of domestic abuse. However, where a police officer responds to a situation and discovers that he has a conflict of interest, that officer exposes himself to § 1983 substantive due process liability if he gives advice that, if followed, increases a person's exposure to harm.

The majority opinion reaches a different result and instead concludes that Mullins's conduct was too remote to be actionable. In reaching that conclusion, the majority opinion identifies several events that occurred after Mullins's advice to Sheets: Sheets obtained an attorney, Sheets reported the situation to the city solicitor's office, a juvenile judge awarded custody to Sheets, the sheriff's department declined to help Sheets reacquire possession of Tiffany, and a municipal judge conducted a hearing and then released Montgomery. In light of these events, and because Tiffany was still alive four days after Mullins's advice, the majority opinion reasons that Mullins's advice was too remote an event to subject him to liability for Tiffany's death. The majority opinion reaches this remoteness conclusion without citing any authority and without providing any reasoning – it simply presents a conclusion. I disagree with that conclusion for two reasons.

her sister, Linda, whom Montgomery had called. Linda drove Sheets to the house of her nephew, Jerry Roach ("Roach"). When Sheets arrived at her nephew's house, Roach immediately called the Gallia County Sheriff's Department to report that Montgomery had threatened to kill Sheets and her children. Neither Linda nor Roach would agree to take Sheets to Shirley Lilly's house to pick up Tiffany. Linda said she did not have enough gas in her car; Roach said he did not want Sheets to leave his house because Montgomery was so angry.

Mullins, who happened to be a long-time personal friend of Montgomery's, was dispatched to investigate Roach's report of a domestic disturbance. When Mullins arrived at Roach's house, Sheets told Mullins that Montgomery had pulled a knife on her and that he had a gun in his car. Mullins checked Sheets for injuries but found no evidence of bruises, red marks, or other obvious signs of injury. Sheets told Mullins that Tiffany was not at Montgomery's house but was staying with Montgomery's sister for the weekend.

Mullins instructed Sheets that, because Monday was a holiday, she would have to wait until Tuesday, February 18, 1997, to file charges against Montgomery. When Sheets told Mullins that she wanted to get Tiffany from Shirley Lilly, Mullins told her to wait until she could go to court.

Mullins later conceded that he doubted the truthfulness of the report related by Sheets. Mullins explained that, knowing Montgomery as he did, he did not believe that Montgomery would hurt anyone. Sheets herself later admitted that, before February 16, 1997, Montgomery had been a good father to Tiffany, had never threatened or harmed Tiffany in any way, and had given Sheets no cause to think he would kill either himself or Tiffany.

Immediately following his interview with Sheets, Mullins made one unsuccessful attempt to locate Montgomery at his residence. Mullins made no other effort to contact Montgomery, to reunite Tiffany with her mother, or to obtain a warrant for Montgomery's arrest. Furthermore, at the end

of his shift, Mullins did not tell the oncoming deputies or their sergeant that Montgomery had threatened to kill Sheets and her children, although he filed an incident report which included the following narrative:

States her live-in boyfriend of 4 years destroyed the household contents, pulled a knife on her and pushed the knife to her stomach (no injury), brandished a rifle and stated he was going to kill her and her kids. States he has been abusive toward her before, and threatened before he would kill her.

Sheets stayed at Roach's house all day Monday, February 17. While there, Sheets received a call from Linda, who advised her that Tiffany was still staying with Shirley Lilly and that Montgomery--who was then with Linda-- wanted to talk with her. Sheets told Linda that "it was over between me and Roger [Montgomery]." When asked at her deposition why she did not make any effort to go to Shirley Lilly's house to get Tiffany while Linda was with Montgomery, Sheets replied: "I don't know."

Early on Tuesday, February 18, 1997, Sheets filed a criminal complaint against Montgomery in municipal court and initiated proceedings in juvenile court to seek temporary custody of Tiffany. Judge Thomas Moulton of the Juvenile Division of the Gallia County Court of Common Pleas conducted a hearing that same Tuesday and signed an order designating Sheets as Tiffany's legal custodian.

On Wednesday, February 19, 1997, Sheets met with a lawyer, who accompanied Sheets to the sheriff's department. When they presented the custody order to Sergeant David Martin ("Martin") for enforcement, they were advised that the custody order, by itself, was insufficient to allow a deputy to pick up a child. Martin told them that a court order directing the department to assist in taking custody of a child was also needed.

On Wednesday night, February 19, Montgomery called Mullins at his residence to ask if a warrant had been issued

police officer in Mullins's position would know that Mullins's conduct violated Sheets's substantive due process rights. In this case, I believe that Sheets satisfied the first requirement, but failed the second.

**Interlocutory Analysis Of The First Qualified Immunity Requirement: Whether Sheets Sets Forth A *Prima Facie* Violation Of Substantive Due Process Rights.**

Under the *DeShaney* holding and its progeny, courts have established that in certain situations, where a police officer affirmatively acts to increase a person's exposure or vulnerability to danger, that officer may be liable for violating that person's substantive due process rights. 489 U.S. 189 (1989); *see also Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("In *DeShaney,* the Supreme Court went further and stated that a duty to protect can arise in a noncustodial setting if the state does anything to render an individual *more vulnerable* to danger."); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990) (noting that "the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action"). This case presents one of the situations where an officer's affirmative act of increasing a specific person's exposure to a particular danger should be actionable.

Here, Mullins investigated a domestic violence call involving one of his life-long friends, Montgomery. Mullins believed Montgomery's side of the story and not Sheets's – despite the death threats that Sheets reported. Because Mullins's judgment was compromised by his friendship with Montgomery, Mullins had a conflict of interest that prevented him from fairly investigating the domestic abuse call. Furthermore, due to his friendship with Montgomery, Mullins was not in a position where he could be objective. Nor was he in a position where he could give reasonable, reliable advice to Sheets. Instead of declining to give advice or

—————————————

**CONCURRENCE**

—————————————

R. GUY COLE, JR., Circuit Judge. I respectfully disagree with the majority's analysis. In contrast to the majority opinion, I believe that Sheets sets forth a *prima facie* case for a substantive due process violation under 42 U.S.C. § 1983. Nevertheless, I reach the same conclusion as the majority because I agree that a reasonable officer would not have known that Mullins's conduct violated a federal right. Thus, I concur in the conclusion that qualified immunity protects Mullins from suit.

On interlocutory appeal, an appellate court has limited ability to consider a denial of qualified immunity. Generally, the doctrine of qualified immunity protects public officials from suit as long as two conditions are satisfied. *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001). First, the plaintiff must demonstrate a violation of a federal right. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). Second, the right violated must be so clearly established that a reasonable official would understand that his or her conduct violated that right. *Id.*; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). On interlocutory appeal, however, a court does not automatically have complete jurisdiction over those two issues. Rather, a court may consider only issues of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1986); *Klein v. Long*, 275 F.3d 544, 549 (6th Cir. 2001); *Turner v. Scott,* 119 F.3d 425, 427-28 (6th Cir. 1997); *see also Johnson v. Jones*, 515 U.S. 304, 309-11 (1995) (discussing the scope of interlocutory appeal generally). Thus, in reviewing the denial of qualified immunity on interlocutory appeal here, this Court may evaluate two questions: (1) whether the evidence in the factual record, when construed in a light most favorable to Sheets, sets forth a *prima facie* case of a violation of her substantive due process rights; and (2) whether a reasonable

for his arrest. In fact, a warrant had been issued, but Mullins --who had not been involved in the matter since his initial interview with Sheets--was unaware of what, if anything, had happened since Sunday. Mullins advised Montgomery to check with the court in the morning and to turn himself in if a warrant had been issued.

On Thursday morning, February 20, 1997, Montgomery voluntarily appeared in the Gallipolis Municipal Court on an initial appearance with regard to the domestic violence complaint filed by Sheets. The municipal court judge released Montgomery on his own recognizance, subject to the provisions of a temporary protective order in favor of Sheets. The municipal court refused to order Montgomery to give up physical custody of the child, finding that the issue was one within the exclusive jurisdiction of the Gallia County Juvenile Court. The Juvenile Court, through Judge Moulton, entered an order later that day directing the Gallia County Sheriff Department to accompany and assist Sheets in getting possession of Tiffany. Unfortunately, before that court order was executed, Montgomery shot and killed Tiffany as well as himself.

Sheets filed suit against Mullins, among others, on February 13, 1998. She alleged that, by his acts, Mullins violated Tiffany's and her rights to due process of law and equal protection. Mullins moved for summary judgment, arguing that there is no constitutional right to protection from violence perpetrated by a private citizen and, even if there were, Mullins enjoyed qualified immunity from suit under the particularized circumstances of this case. The district court granted Mullins' motion with regard to the claims for procedural due process and equal protection but denied his motion with respect to the substantive due process claim. The district court rejected Mullins' qualified immunity defense as to the substantive due process claim, finding that "a reasonable official in the position of Sergeant Mullins should have known that a party's right to substantive due process is violated by a public actor whose conduct significantly increases the risk of injury from a third party." Mullins now

appeals the district court's decision regarding his qualified immunity defense. Sheets argues that we have no jurisdiction over the appeal.

## II.  DISCUSSION

### A.  Jurisdiction

Sheets argues that jurisdiction over this interlocutory appeal is lacking because the trial court found that there was a genuine issue of material fact as to whether Mullins rendered Tiffany more vulnerable to danger through his actions. Indeed, a defendant may not appeal a district court's order denying a claim of qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995). To the extent that a district court's denial of a claim of qualified immunity turns on an issue of law, however, the Supreme Court has held that the denial constitutes a final, appealable decision within the meaning of 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).

In this circuit, it is well established that, for appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case. *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999) (citing *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (explaining that "in order for . . . an interlocutory appeal based on qualified immunity to lie, the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case")), *cert. denied*, 530 U.S. 1264, 120 S. Ct. 2724, 147 L. Ed. 2d 988 (2000). Here, for purposes of his motion for summary judgment, Mullins is not disputing the facts; rather, he contends that, even if the evidence is viewed in the light most favorable to Sheets, he cannot be held liable for a violation of Sheets's substantive due process rights. He is thus arguing the pure legal question

Mullins. We accordingly REMAND to the district court for entry of judgment.

where police officers not only failed to investigate reports of an abduction but also lied about their actions. Needless to say, we did not specify what police action would have been necessary, hypothetically, to support the imposition of liability for a substantive due process violation.

In *Kallstrom*, decided in February of 1998, a year *after* Mullins responded to the call about Sheets, we noted that no court within the Sixth Circuit had yet held the state or a state actor liable for private acts of violence under the state-created-danger theory. Indeed, before *Kallstrom* was decided and before Mullins acted in February of 1997, there was only one reported decision from a court within this circuit that had even allowed a private-act-of-violence case to survive a motion for summary judgment. *Smith v. City of Elyria*, 857 F. Supp. at 1203. In *Smith*, the district court denied the city defendant's motion for summary judgment because there was evidence that the victim's abusive ex-husband may have used the apparent authority given to him by police officers--who told him to remain in his ex-wife's home against her will--to facilitate the killing of his victim. Although we know the case survived a motion for summary judgment, we do not have the benefit of a reported decision to let us know how the case was ultimately resolved.

While each of these cases generally suggests that an officer might be liable if he renders a victim more vulnerable to danger, not one of them convinces us that, in February of 1997, Mullins should have known that he would violate the substantive due process rights of Sheets by acting as he did. Absent law that would have put Mullins on notice that his particular conduct offended the Constitution, we find that he is entitled to qualified immunity.

### III. CONCLUSION

Having found that Mullins did not violate the substantive due process rights of Sheets and/or Tiffany, much less their clearly established rights, we REVERSE the district court's order denying the defendant's motion for summary judgment as to the plaintiffs' substantive due process claim against

of whether the facts as construed in favor of Sheets constitute a violation of clearly established law. That is a question over which we have appellate jurisdiction. *See Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) (explaining that a district court's reasoning that there is an issue of fact does not immunize issues of law underlying the qualified immunity analysis).

### B. Qualified Immunity

Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). We review a district court's denial of qualified immunity *de novo*. *Shehee*, 199 F.3d at 299. The defendant bears the burden of pleading the defense, but the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991).

The Supreme Court has said that, in deciding whether an official is entitled to qualified immunity, the first step in the analysis is deciding whether there has been a violation of a constitutional right in the first instance. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991) (explaining that "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all"). The analysis of whether Sheets has asserted a violation of a constitutional right begins with the Supreme Court's decision in *DeShaney*

*v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S. Ct. 998, 103 L.Ed.2d 249 (1989).

In January of 1982, when Joshua DeShaney ("Joshua") was three years old, the Winnebago County Department of Social Services ("DDS") received a report that Joshua was being physically abused by his natural father. DDS investigated the abuse charges against Joshua's father but took no action to remove the boy from the father's home. In January of 1983, after Joshua was admitted to a hospital with multiple bruises and abrasions, custody was temporarily withdrawn from the father. Joshua was returned to his father's custody when a team of county officials determined that there was insufficient evidence of child abuse. A month later, Joshua was treated at the emergency room for suspicious injuries. During monthly visits in the next six months, the DDS caseworker assigned to monitor Joshua's situation observed suspicious injuries on the boy's head. In November of 1983, Joshua was again treated at the emergency room for injuries believed to be caused by child abuse. For two visits thereafter, the caseworker was told that Joshua was too ill to see her. Despite the evidence of suspicious injuries and possible child abuse, no attempts were made to remove Joshua from his home. In March of 1984, when Joshua was four years old, his father beat him so severely that he sustained severe brain damage and fell into a life-threatening coma.

Joshua and his mother sued DDS, the caseworkers, and other officials, claiming that DDS and its employees failed to intervene to protect Joshua against a known risk of violence. Affirming the trial court's dismissal of the claim, the Supreme Court held that, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 196. The Court rejected the theory that a duty to protect arises from the state's knowledge of an individual's predicament or its expressions of intent to help. The Court recognized, however, that if a state has created a "special relationship" with the victimized individual, then the state may have an affirmative duty to protect that individual. Such

must be clearly established in a particularized sense); *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986) (explaining that "[t]he words 'clearly established . . . constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms").

The district court determined that it was clearly established in February, 1997, that an officer would violate the substantive due process clause by significantly increasing an individual's risk of injury from a third party. To be sure, in 1989 in *DeShaney*, the Supreme Court suggested, but did not hold, that state actors may be liable if they help create the danger that causes an individual's injury by a private party or if they render an individual more vulnerable to injury by a private party. The *DeShaney* Court did not specify how a state might create the danger causing an individual's injury, what actions of a state would render an individual more vulnerable to danger, or by how much the state must increase an individual's risk of injury from a third party before that individual's substantive due process rights are violated. Although it could be said that the state actors in *DeShaney* increased the risk that Joshua would be harmed by his abusive father, the Court, in fact, found no substantive due process violation under the particularized circumstances before it. Those circumstances involved state actors, faced with strong evidence of abuse, removing Joshua from the custody of his father, then returning Joshua to his father, then--despite continued evidence of abuse--failing to again remove Joshua from the father whose abuse ultimately killed him.

Before February of 1997, this circuit had decided only one post-*DeShaney* case involving a substantive due process claim in the context of a private act of violence. *Gazette v. City of Pontiac*, 41 F.3d at 1061. In *Gazette*, we indicated that courts are required by *DeShaney* to ask whether a state actor has rendered an individual more vulnerable to the danger he or she was already in. Like the Supreme Court in *DeShaney*, however, we rejected the plaintiff's substantive due process claim given the particularized circumstances before it--that is,

Assuming the facts to be as Sheets maintains, we find that Mullins did not violate the Substantive Due Process Clause by his conduct on February 16. We also find that Tiffany's death was too remote from Mullins' allegedly wrongful acts to support a finding of proximate cause. Tiffany was killed four days after Mullins responded to Roach's call about Montgomery's threats of violence to Sheets. When Mullins arrived to talk with Sheets, he found her secure in Roach's residence and showing no signs of physical abuse. He learned that Tiffany was not present when Montgomery threatened Sheets but was staying with an aunt. Tiffany was still alive days later, *after* Sheets had obtained an attorney, *after* the situation was reported to the city solicitor's office, *after* a juvenile court judge signed an order awarding custody to Sheets, *after* a sheriff's department sergeant--not Mullins-- explained to Sheets that the sheriff's department could not help her get physical custody of her daughter absent a court order directing the department to do so, and *after* a municipal court judge conducted an initial appearance on the criminal complaint against Montgomery, then released Montgomery on his own recognizance. Under these circumstances, we find no merit to the substantive due process claim against Mullins.

In denying relief to Mullins, the district court wrote: "Based upon the state of the law in February 1997, this Court concludes that a reasonable official in the position of Sergeant Mullins should have known that a party's right to substantive due process is violated by a public actor whose conduct significantly increases the risk of injury from a third party." We think the district judge described the right that Mullins allegedly violated too broadly. As the Supreme Court explained in *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987), the "clearly established" standard becomes meaningless if the relevant "legal rule" is defined in abstract or general terms. Instead, the relevant "legal rule" must be articulated in a particularized sense, such that the contours of the rule are sufficiently clear to put a reasonable official on notice that what he is doing is probably unlawful. *See, e.g.*, *Gable v. Lewis*, 201 F.3d 769, 771 (6th Cir. 2000) (recognizing that the constitutional right asserted

a "special relationship" exists, for example, where the state has some sort of control or custody over the individual, as in the case of prisoners, involuntarily committed mentally ill persons, or foster children. In explaining that DDS and its employees did not have such a "special relationship" with Joshua, the Supreme Court wrote: "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201.

A number of circuit courts of appeals--including the Sixth Circuit--have relied on this passage in *DeShaney* to acknowledge that liability may exist where the state creates a dangerous situation or renders citizens more vulnerable to danger. *See, e.g.*, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (acknowledging that "[a]lthough our circuit has never held the state or a state actor liable under the Fourteenth Amendment for private acts of violence, we nevertheless have recognized the possibility of doing so under the state-created-danger theory"). In *Kallstrom*, a right-to-privacy case decided one year after the events at issue here, this court held the City of Columbus liable for releasing private information about undercover officers and their families--including home addresses, phone numbers, and pictures--to lawyers representing violent gang members against whom the undercover officers had testified. The court determined that the City's action placed the officers and their families in "special danger" and, therefore, constituted a violation of their fundamental rights to privacy and personal security under the substantive component of the Due Process Clause.

In an earlier case, *Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994), we rejected a substantive due process claim made by Cheriee Gazette ("Gazette"), whose mother, Pamela Bandy ("Bandy"), was found dead in the trunk of her car six days after she was abducted from a car wash in Pontiac, Michigan. Bandy died from starvation, dehydration, and methanol poisoning from drinking windshield fluid in the

trunk.   On the morning of Bandy's abduction, Gazette reported her mother's disappearance to the City of Pontiac Police Department.  The police, who were well-acquainted with Bandy, told Gazette that her mother was an alcoholic and would come home when she finished "bingeing."  The police also told Gazette that they had investigated the car wash for evidence of Bandy's disappearance when, in fact, they had not.   Furthermore, although Gazette gave the police information about Bandy's bank account, the police failed to act on the information, learning only after Bandy's death that a bank camera had videotaped Bandy's abductor withdrawing all the funds from her account.

Gazette sued the police, claiming--among other things--that the police had rendered Bandy more vulnerable to the danger created by her abductor.  Specifically, Gazette asserted that the police lied about the investigation, that their lies kept Bandy's family and/or friends from conducting their own investigation, and that, as a result, Bandy was rendered more vulnerable to the danger than she would otherwise have been.  While acknowledging that *DeShaney* required it "to ask whether the City or the police officers rendered Bandy any more vulnerable to the danger she was already in by their actions," *Gazette*, 41 F.3d at 1065, we nonetheless rejected Gazette's more-vulnerable-to-danger claim.  The court first determined that "[t]he causal connection between the police officers' lies and Bandy's death simply [wa]s not sufficient to sustain a Section 1983 claim for deprivation of Bandy's due process rights." *Gazette*, 41 F.3d at 1067.  The court then went on to say that the "act" which might have made Bandy more vulnerable to danger--that is, the decision of the police not to investigate the car wash and Bandy's bank account-- was precisely the kind of act that, under *DeShaney*, was insufficient to render a police officer liable to a victim harmed by a private actor.

Just months before *Gazette* was decided, a district court in the Northern District of Ohio considered the case of a woman, Karen Guerrant ("Guerrant"), who was killed by her ex-husband after police officers responded to her call for help but

declined to order the ex-husband to leave her house. *Smith v. City of Elyria*, 857 F. Supp. 1203 (N.D. Ohio 1994).  On motions for summary judgment, the district court determined that the defendant police officers were entitled to qualified immunity from the victim's claim that they violated her substantive due process rights.  The district judge concluded that "the *DeShaney* decision did not *clearly* establish that the police have a duty to protect when they create or enhance the danger to a potential victim of private violence." *Smith*, 857 F. Supp. at 1214 (emphasis in original).  The city defendant, on the other hand, was denied summary judgment on the victim's substantive due process claim because the district judge determined that the evidence presented a genuine issue of material fact about whether the city, through the police department, "affirmatively increased the danger to [Guerrant] while limiting her ability to help herself and made her more vulnerable to attack, then refused to help her." *Smith*, 857 F. Supp. at 1210.  Finding evidence in the record that the police officers advised the ex-husband to stay in the house despite the victim's repeated attempts to remove his personal belongings from her home, the district judge thought it important that the ex-husband may have "used the apparent authority given to him by the police to remain in his ex-wife's home against her will, and later killed her." *Id.*

In this case, Sheets claims that Mullins rendered Tiffany Montgomery more vulnerable to danger by preventing Sheets from engaging in "self-help."  He did so, she says, primarily by telling her that she should get a court order before she tried to regain physical custody of Tiffany.  Sheets also suggests that she might have obtained custody of Tiffany, thus preventing the child's death, if Mullins had secured the child the day Sheets called for help, if Mullins had arrested Montgomery that same day, or if Mullins had communicated the situation to other officers in the department, who themselves might have arrested Montgomery.  According to Sheets, if Mullins had acted in any of those ways, she might have been able to regain custody of Tiffany without fear of, or interference from, Montgomery.