NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0179n.06
Filed: April 4, 2008

No. 06-4069

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALEXANDRU NERGHES, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON PETITION FOR REVIEW |
| | ) | OF AN ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| MICHAEL MUKASEY, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before:        BOGGS, Chief Judge; GIBBONS; Circuit Judge; BELL, District Judge.[*]

BOGGS, Chief Judge.   Alexandru Nerghes appeals an order of the Board of Immigration Appeals ("BIA").  The BIA ordered Nerghes deported, reversing the ruling of an Immigration Judge ("IJ") who had granted Nerghes a deferral of removal under the Convention Against Torture ("CAT").  Our review is limited to "constitutional or legal questions" because Nerghes was ordered deported after committing an "aggravated felony."  Nerghes's sole legal argument is that the BIA applied the wrong legal standard for "torture" by failing to acknowledge that governmental "willful blindness" to private abuses can constitute "torture."  We reject this argument and affirm.

I

---

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

Alexandru Nerghes, age forty, is a native and citizen of Romania. He is also a Roma, or Gypsy,[1] an ethnic and cultural group that has often been persecuted throughout eastern Europe. Along with his parents, he entered the United States legally on August 30, 1975, and has lived in Cleveland, Ohio, since that time. Nerghes alleges that he has never returned to Romania, knows no family there, and speaks only "a word or two" of Romanian.

On April 11, 2003, an Ohio state jury convicted Nerghes of felonious assault and rape. Both counts arose from the same attack on his girlfriend that ended with her in the hospital. Five days later, the judge sentenced him to two concurrent five-year prison terms for the two crimes. The Ohio Court of Appeals upheld both convictions on March 17, 2004. Nerghes has been incarcerated throughout these proceedings.

Under United States immigration law, resident aliens who commit certain aggravated felonies, including those for which Nerghes was convicted, are subject to deportation. *See* 8. U.S.C. § 1227(a)(2)(A)(iii). Nerghes received a "Notice to Appear in Removal Proceedings" on August 4, 2004. On June 16, 2005, Nerghes filed to defer removal under the regulations implementing the CAT. The IJ held a full hearing on February 24, 2006.

---

[1] We use the term "Roma" throughout this opinion because"Roma" is more accurate given that numerous non-Romani ethnic groups have been called "Gypsies." *See* http://en.wikipedia.org/wiki/Gypsy (last visited March 31, 2008). Furthermore, many Roma object to the term "Gypsy" to be "pejorative." *See* http://en.wikipedia.org/wiki/Roma_people (last visited March 31, 2008).

Mr. Nerghes's mother, Eva Nerghes, testified first.[2] She explained that the family left Romania in 1975 to escape anti-Roma persecution. She testified that the family were treated as the "last people" in their village because of their ethnicity, and that when they applied for a visa to leave, the police officers beat and punched the couple while the superior officer sat around "laughing." Finally, she said that she had no family left in Romania and that Alexandru would suffer persecution if he were forced to return.

Alexandru Nerghes then testified that he had never returned to Romania, knew no one there, and spoke very little Romanian. He stated that he feared returning because he "don't know nothing [sic] about that country, sir. . . . I grew up here. This is all I know." When asked why else he feared to return, he responded that he "would be tortured . . . because of my race."

Nerghes's expert, Mr. Ronald Lee, spoke last. Lee is a semi-retired journalist and author from Toronto, Canada, and a Roma himself. He testified that he has interviewed hundreds of Roma refugees, has written about the plight of the Roma, and has worked with organizations that help Roma integrate into Canadian society. Lee speaks Romani (the language of the Roma) fluently even though he has been to Romania only once.

Lee testified at length about how the Roma are "at the bottom of the pecking order" in Romania and face a strong negative stereotype from the non-Roma population. Lee claimed that there have been 53 pogroms against the Roma in Romania since the fall of communism, and individual attacks are common in rural areas. The police "rare[ly]" investigate these crimes; they

---

[2]Eva Nerghes testified that she became a citizen in 1987. 8 U.S.C. § 1433(a) permits parents who achieve citizenship to naturalize their foreign-born children only if the child is under eighteen. Alexandru Nerghes was born in 1967 and thus was twenty when his mother was naturalized.

are more likely to stand around and make sure the pogrom "fires d[on't] spread to houses owned by Romanians." Whenever a crime is discovered, Roma are routinely rounded up as "the usual suspects" and sometimes beaten by police in order to force a confession. Because private citizens are free to refuse to rent to Roma and add "no Roma need apply" to job applications. Roma often live in substandard conditions, and unemployment among the Roma is around sixty percent.

Lee acknowledged that the Romanian government does not persecute the Roma, but that persecution arises instead from the "mindset of the people" that the government cannot, or will not, control. While admitting that the Romanian government has passed laws favorable to the Roma, Lee claimed that the laws were "cosmetic" attempts to further its admission to the EU and are rarely enforced. A final threat, Lee added, came from the mafia, which often extort or threaten the Roma because they know that the Roma cannot go to the police.

According to Lee, the Roma rely on extended family support to cope with these harsh conditions. He emphasized that because Nerghes has no relatives left in Romania, he would not be able to access this support system. Lee added that Nerghes would be immediately recognized as a Roma based on his physical features, and that the community would learn that he had been deported for a felony, and therefore the police would be even more likely to abuse Nerghes.[3]

Nerghes also submitted documentation on the current country conditions in Romania. The State Department's 2004 *Country Report* on Romania says that:

---

[3] At oral argument, the government suggested that the Romanian government need not find out about the convictions because aliens like Nerghes are not always sent back "chained to a Marshal." However, there is no evidence in the record either way on this point. Fortunately, the method of Nerghes's return is immaterial to our decision today, but we would find evidence on this point helpful in future cases where the method of return is relevant.

> The Government generally respected the human rights of its citizens; however, there were problems in some areas. Police officers sometimes beat detainees and reportedly harassed and used excessive force against Roma. While some progress was made in reforming the police, cases of inhuman and degrading treatment continued to be reported. Investigations of police abuses generally were lengthy and inconclusive, rarely resulting in prosecution or punishment.

The Report went on to state that "no extrajudicial killings," took place, but the Report found "credible reports that police beat detainees," and identified two incidents where police and accompanying civilian thugs beat Roma civilians. It lists several government programs designed to help the Roma, but describes the programs as "understaffed and undertrained." The 2003 State Department *Country Report* contains substantially similar statements.

Nerghes also submitted a 2004 Amnesty International report that discusses Romania and lists two incidents where private security guards beat Roma civilians. A series of reports from the European Romani Rights Center discusses the Roma situation. The upshot of these reports is that in addition to severe discrimination, two or three dozen reported attacks on Roma occur each year, and they range from fatal beatings to property destruction to minor street violence. Police officers occasionally perpetrate the attacks, but they are more likely to look the other way when they happen. These documents paint a bleak picture of life in Romania as a Roma, but a picture less harsh than the picture Lee paints.

On February 24, 2006, the day of the hearing, the IJ found Nerghes removable based on conviction of an aggregated felony, but granted Nerghes's request to defer deportation under the CAT. The IJ first found Nerghes and his witnesses credible, and then found that the evidence painted a "grim" picture for a Roma in Romania. Four facts informed the IJ's decision that Nerghes was more likely than not to be tortured if returned to Romania: 1) Nerghes has no status and no

family protection in Romania; 2) Nerghes cannot speak Romanian and thus cannot communicate; 3) Nerghes does not even have a high school education and therefore faces bleak job prospects; and 4) Nerghes's criminal record will make him an immediate target for the Romanian police. According to the IJ, these facts make Nerghes particularly vulnerable to mistreatment well beyond "routine police brutality." Most importantly, the IJ concluded that the Romania government would "acquiesce" to this "systematic and severe mistreatment," because the record showed that "the government of Romania is willfully blind to the conduct of its citizens and police forces."

The government appealed this decision to the BIA. On July 11, 2006, a split BIA panel reversed the IJ's decision. J.A. at 6–10. While the BIA found no "clear error" in the IJ's credibility findings, it nevertheless held that Nerghes failed to prove that it was "more likely than not that he would be subjected to torture if returned to Romania." *Id.* at 6–7. The BIA acknowledged that the record showed that incidents of violence and discrimination against the Roma were "a problem in Romania," but reasoned that because of recent improvements in country conditions documented in State Department Reports, it was "not more likely than not that a *public official would consent or acquiesce*" to whatever mistreatment Nerghes faced. *Id.* at 7 (emphasis added). Therefore, any mistreatment, no matter how severe, would not be *torture* within the meaning of the CAT.

The BIA also "discounted" Mr. Lee's testimony, finding that while it was "probative and useful," it deserved less weight than the IJ afforded it because Lee had no degree in any relevant field. *Id.* at 8. Finally, the BIA concluded that the "four factors" identified by the IJ were relevant only to Nerghes's risk of hardship and not to the probability of torture. *Id.* at 9. The dissenting judge

believed that these four factors were relevant to the probability of torture,[4] but favored remanding the case to the IJ because she was skeptical of some of Nerghes's factual claims. *Id.* at 10.

Nerghes now appeals. We have jurisdiction under 8 U.S.C. § 1252.

## II

We begin by explaining the limits to our jurisdiction and then consider Nerghes's sole claim over which we have jurisdiction. Our court determines its own jurisdiction de novo. *Abu-Khaliel v. Gonzales*, 436 F.3d 627, 630 (6th Cir. 2006). We review the BIA's construction of a statute to determine if it is "manifestly contrary to the law." *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006).

## A

Resident aliens such as Nerghes who commit certain "aggravated felonies" listed in 8 U.S.C. § 1227(a)(2)(A)(iii) are subject to removal. Nerghes concedes his removability under this statute. The statute is part of a larger scheme designed to "expedite the removal of aliens who have been convicted of aggravated felonies," *Zhang v. INS*, 274 F.3d 103, 108 (2d Cir. 2001), and one of Congress's tools to accomplish that goal was a provision that limits our jurisdiction. Under the statutory scheme Congress established,

> [n]otwithstanding any other provision of law (statutory or nonstatutory), . . . *no court shall have jurisdiction to review any final order of removal* against an alien who is

---

[4]Although the parties do not argue this point, the dissenting judge was correct. While Nerghes's inability to speak Romanian and lack of family connections may be relevant to hardship, and hardship is usually irrelevant to torture, these factors are also logically relevant to the probability that he will be picked up and beaten by the police and therefore relevant to the statistical likelihood of torture in this case.

> removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title . . . .

8 U.S.C. § 1252(a)(2)(C) (emphasis added).

This bar to jurisdiction is qualified by the next subparagraph:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of *constitutional claims or questions of law* raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

*Id.* at § 1252(a)(2)(D) (emphasis added).

We therefore have jurisdiction over Nerghes's claims only to the extent that they are "constitutional claims or questions of law."

Our circuit has stated that the phrase "questions of law" in § 1252(a)(2)(D) means "matters of statutory construction." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). These "matters" subject to review include whether the alien's crime was an aggravated felony, *Patel v. Ashcroft*, 401 F.3d 400, 407 (6th Cir. 2005), and "whether the BIA used the correct standard in reviewing the IJ's decision and whether it [the BIA] assigned him [the alien] the correct burden of proof." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006). They do not include "discretionary or factual questions." *Almuhtaseb*, 453 F.3d at 748. The alien in *Tran* admitted that he was removable because he committed an aggravated felony, but, like Nerghes, he sought to defer removal under the CAT. *Id.* at 938. The BIA rejected his claim, and we affirmed because Tran raised no legal issues. *Id.* at 243. More recently, we held once again that when an alien facing removal after committing an aggravated felony raises "only a question of fact . . . we are without jurisdiction" to hear the appeal. *Pepaj v. Mukasey*, 509 F.3d 725, 728 (6th Cir. 2007) (refusing to consider alien's argument about

changed country conditions). These cases show that our circuit has explicitly and repeatedly held that its jurisdiction in cases such as Nerghes's is limited to "pure" questions of law such as statutory construction and whether the correct standard was applied. Nerghes raises one such question: whether the BIA applied the correct legal definition of "torture."

B

Torture is "any act by which severe pain or suffering, whether mental or physical, is intentionally inflicted on a person . . . by or at the *instigation of* or with the *consent or acquiescence of a public official* or other person acting in an official capacity." *Singh v. Ashcroft*, 398 F. 3d 396, 404–05 (6th Cir. 2005) (quoting 8 C.F.R. § 208.18(a)(1) (emphasis added)). Purely private mistreatment, even extreme abuse that one might commonly call torture, is not "torture" under the CAT because there is no governmental involvement.

This requirement makes relief under the CAT more difficult to obtain than other forms of relief under the INA because "torture" requires governmental "consent or acquiescence" to private abuses. "Torture" also covers a narrower, more severe category of abusive conduct than "persecution" for purposes of asylum. *Mouawad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007). Furthermore, under the CAT the petitioner must prove that it is more likely than not that he will be tortured if returned to his native country, 8 C.F.R. § 1208.16(c)(2), while an alien can obtain asylum by showing only a "well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A). We have not said how probable persecution must be in order for the alien's fear of persecution to be well-founded, but we have stated that the alien's burden of proof is "significantly greater" under the CAT. *Sarr v. Gonzales*, 485 F.3d 354, 362 (6th Cir. 2007). This makes sense, because the CAT explicitly requires

the alien to show that a greater than fifty percent chance of torture exists to obtain relief, but one can easily have a well-founded fear when the probability of abuse is, say, twenty-five percent. But relief under the CAT is easier to obtain in one respect: the applicant need not show that "he fears future harm on the basis of any statutorily-defined ground." *Mouawad*, 485 F.3d at 413. The critical question for this case is what a "public official" must do, or not do, to "acquiesce" to private citizen's conduct to make that conduct "torture." Federal regulations provide that the official must know of the private abuse and "breach his or her legal duty to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7).

One BIA case, *In Re S-V-*, 22 I. & N. Dec. 1306 (2000), held that under this regulation, the officials must "willfully accept" the torturous activities of private parties. *Id.* at 1312. Multiple courts of appeal, including our own, have rejected this holding as "manifestly contrary to the law." *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006) (citing cases from the Second and Ninth Circuits). The correct interpretation is that "acquiescence" does not require "*willful acceptance*" of private parties' activities, but can be satisfied if the officials are *willfully blind* to what is happening. *Amir*, 476 F. 3d at 927. "Willful blindness" is "deliberate avoidance of knowledge." *Black's Law Dictionary* (8th ed. 2004). It can co-exist with either approval or disapproval of the activity to which one is willfully blind.[5] Nerghes argues that the BIA incorrectly applied the "willful acceptance"

---

[5]For example, in *Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003), Mr. Zheng feared violence at the hands of the "Snakeheads," a powerful Chinese criminal organization who had initially smuggled Zheng out of China and into the United States. The Chinese government, while not *accepting* or *approving* of the Snakeheads' private violence, refused to step in and prevent the violence because it pretended that the Snakeheads did not exist. Acting would require the government to acknowledge the Snakeheads' existence and thereby "lose face," something the government was unwilling to do. *Ibid.*

standard rather than the "willful blindness" standard because it never referred to "willful blindness,"

and cited *Matter of S-V-*.

C

Although the BIA decision is not a model of clarity or judicial craftsmanship, three reasons

support finding that it applied the correct standard. The relevant BIA discussion follows:

> Further, the harm feared must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1); *see also Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001). When the alien alleges a likelihood of torture from nongovernmental actors, he or she must establish that the torture feared would be inflicted by or with the acquiescence of a public official or other person acting in an official capacity. To demonstrate acquiescence, the respondent must do more than show that the officials are simply aware of the activity constituting torture and are powerless to stop it. *See Matter of S-V-*, 22 I & N Dec. 1306, 1312 (BIA 2000). A public official's acquiescence to torture "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.(a)(7).

J.A. 7. First, the BIA cited *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001). J.A. 7. This citation is

to the specific page in the specific case where our court discussed the definition of torture and the

quoted language appears in the same paragraph that established that the term "acquiescence" included

"willful blindness." *See Ali*, 237 F.3d at 597. *Amir* had not yet been decided when the BIA issued

its decision in this case, so the BIA cited the strongest then-existing authority in our circuit for the

willful blindness standard.[6]

---

[6]The dissent suggests that the citation tells us little. On that reading, the BIA did not cite *Ali* when defining "acquiescence," but cited only *Matter of S-V-*. Dissenting Op. at 2. We respectfully disagree and point out that the BIA discussed and defined "acquiescence" throughout the entire above-quoted paragraph, and that the BIA cited *Ali* before, and the regulations both before and after, the citation to *Matter of S-V-*.

Second, the proposition for which the BIA cited *Matter of S-V-* is not the proposition from the case that has been held "manifestly contrary to the law." Instead, the BIA cited *Matter of S-V-* for a proposition is logically true and still good law. The BIA wrote that "respondent must do more than show that the officials are simply aware of the activity constituting torture and are powerless to stop it. *See Matter of S-V-*, 22 I & N Dec. 1306, 1312 (BIA 2000)." J.A. 7. This is a logically true statement because the person seeking relief must show something more than knowledge and a lack of power; he or she must show *acquiescence*, and acquiescence can, in turn, be proven through willful blindness. A government can know about private abuses, and instead of pretending they do not happen, seek to stop them, but lack the power to do so. It is a legally correct statement because, as the Eighth Circuit explained, "[a] government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it, but it does cross the line into acquiescence when it shows willful blindness toward the torture of citizens by third parties." *Mouawad*, 485 F.3d at 413. By contrast, *Amir* held that *Matter of S-V-*'s statement that the alien must show that "officials are *willfully accepting*" the torturous activities of private parties is manifestly contrary to the law. *Amir*, 467 F.3d at 927. (emphasis in original). The "willful acceptance" requirement is contrary to the law, but it is not in the BIA opinion.

Third, the BIA's language mirrors that of cases where courts have found that the BIA applied the correct standard more closely than it resembles the language in cases where courts concluded the opposite. The BIA quoted the correct regulatory definition of "torture," and while it did not use the words "willful blindness," it need not mechanically recite the specific words "willful blindness" in every case. Courts have not imposed such a requirement. *Cruz-Funez v. Gonzales*, 406 F.3d 1187,

1192 (10th Cir. 2005) (BIA correctly applied "willful blindness" standard even though the BIA opinion did not use the words "willful blindness"). By contrast, in cases where a court of appeals held that the BIA applied the wrong standard, the BIA opinions usually contain language patently inconsistent with the willful blindness standard. *See, e.g.*, *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006) (BIA ignored willful blindness test by requiring petitioner to show that the government "sanctioned" his torture); *Reyes-Reyes v. Ashcroft*, 384 F.3d 782, 787 (9th Cir. 2004) (BIA ignored willful blindness test by requiring petitioner to show that he would be tortured "by or at the instigation of the government"). Nerghes cannot point to any such language in the BIA's opinion in his case.

In our recent case of *Tran*, we remanded to the BIA for clarification, holding that we could not determine whether the BIA applied the correct standard of review. *Tran*, 447 F.3d at 944. Our dissenting colleague believes that we should do so here. The dissent offers a plausible reading of the record, but we do not think it offers the best reading. In *Tran*, the BIA did not "refer[] to *any* standard of review," *ibid.*, while in this case, the BIA quoted the correct regulatory standard, never referenced the erroneous "willful acceptance" standard and cited the then-leading case in which our circuit determined that the standard included "willful blindness." While the BIA should have spoken more clearly, we are satisfied that it applied the correct legal standard.

III

Nerghes argues that the BIA committed "legal" error by improperly discounting the testimony of his expert witness and by "rendering a decision which was not compelled by the evidence simply

because it did not agree with the IJ." Both errors are no more than factual appeals dressed up as legal challenges, and are therefore not reviewable.

The BIA held that while Mr. Lee's testimony was "probative and useful," it should have been given "diminished weight" because he lacked any formal education in the field, had never been to Romania, and relied on "anecdotal interviews" and "internet articles" in reaching his conclusions. J.A. 8. Nerghes offers an extensive argument as to why Lee should be considered an "expert" under the Federal Rules of Evidence. We need not consider the merits of this argument because the Federal Rules of Evidence do not apply at immigration proceedings. *Singh v. Ashcroft*, 398 F.3d 396, 406 (6th Cir. 2005). A "violation" of irrelevant rules cannot be a legal error. *See ibid.* Furthermore, we note that evidentiary matters in immigration hearings are governed only by the principles of due process. *Ibid.* Nerghes received due process, as even the BIA acknowledged that Mr. Lee's testimony was "probative."

As mentioned earlier, we have jurisdiction to review whether the BIA applied the correct burden of proof. *Tran*, 447 F.3d at 943. Here, the BIA applied the correct burden, that Nerghes must show that it is "more likely than not" that he will be tortured if he returns to Romania. J.A. 9. Nerghes nevertheless contends that the BIA committed a legal error by overturning the IJ's decision when "substantial evidence" supported the IJ's conclusion. (Pet'r Br. 17) (citing *INS v. Elias-Zacharias*, 502 U.S. 478, 481 (1992)). Case law forecloses this argument.

At the outset, Nerghes fails to realize that the "substantial evidence" test under *INS v. Elias-Zacharias*, applies only when a court reviews the BIA or IJ. The BIA reviews the IJ under a "clearly

erroneous" standard. *See* 8 U.S.C. § 1252(b)(4)(A). This is precisely what the BIA did in this case. J.A. 6 (citing 8 U.S.C. § 1252(b)(4)(A), and explaining that review is for clear error).[7]

Nerghes's real claim is that the BIA incorrectly weighed the evidence when it held that the Nerghes failed to meet his burden of proof and that the IJ's contrary conclusion was clearly erroneous. This is a plausible argument, but not a legal question which we may review. *Pepaj*, 509 F.3d at 728 (proof of changed country conditions is factual, not legal); *Tran*, 447 F.3d at 943 (weight of evidence is a factual conclusion); *Hamid v. Gonzales*, 417 F. 3d 642, 647 (7th Cir. 2005) (holding IJ decision of whether torture was "more likely than not" to be a factual, not legal question).

Nerghes faces an unpleasant future in Romania, but whether he can meet the difficult burden of proving that the future is so grim that it includes a greater than fifty percent chance of torture is a question we need not, and indeed cannot, consider. Nerghes's only claim over which we have jurisdiction lacks merit, and we cannot consider his other claims without ignoring settled law in our circuit. The judgment of the BIA is affirmed.

---

[7] Nerghes may have thought he was arguing that the BIA failed to apply the "clearly erroneous" standard when it reviewed the IJ when he referred to the substantial evidence test in his brief. While failure to apply the "clearly erroneous" standard is a reviewable question of law, *Tran*, 447 F.3d at 943, it is not an argument Nerghes made. Even if we were to consider the issue, the claim would fail because the BIA cited the correct "clearly erroneous" standard. J.A. 6.

**JULIA SMITH GIBBONS, Circuit Judge, dissenting.**  Because we cannot ascertain that the BIA applied the correct standard for torture through "acquiescence," pursuant to 8 C.F.R. § 1208.18(a)(7), and because the proper course in such instances is to remand, I respectfully dissent.

As the majority correctly notes, "acquiescence" does not require "willful acceptance" by a public official; "willful blindness" will suffice.  *See Amir v. Gonzales,* 467 F.3d 921, 927 (6th Cir. 2006).  As the majority also notes, remand to the BIA is appropriate where we are unable determine whether the BIA has applied the correct legal standard.  *See Tran v. Gonzales*, 447 F.3d 937, 944 (6th Cir. 2006).  Here, although the BIA did not mention the "willful blindness" standard and cited a case that provides the wrong standard, the majority nonetheless strains to conclude that the BIA applied the correct standard.  I am unpersuaded by the majority's reasoning.

First, the majority reads this court's decision in *Amir v. Gonzales* too narrowly.  In *Amir*, this court explained:

> In the case at bar, the IJ applied *In Re S-V-,* 22 I. & N. Dec. 1306 (2000), to Amir's CAT claim. In *S-V*, the BIA held that a petitioner "must do more than show that the officials are aware of the activity but are powerless to stop it. He must demonstrate that ... officials are *willfully accepting* of the guerillas' torturous activities." *Id.* at 1312 (emphasis supplied). Because Amir did not show that the Indonesian government was willfully accepting of the fanatical Muslim activity, the IJ dismissed the CAT claim *without further analysis.*
>
> We join the Ninth and Second Circuits in holding that *In Re S-V*- directly conflicts with Congress's clear intent to include "willful blindness" in the definition of "acquiescence." . . . Today we explicitly hold that the IJ's reliance on *In Re S-V* was manifestly contrary to the law.

467 F.3d at 927 (emphasis added).  In other words, the *Amir* court remanded not only because the IJ had erroneously applied the "willful acceptance" standard, but because the IJ *had not analyzed*

- 16 -

*whether public officials were willfully blind. Id.* The BIA's analysis in this case also suffers from the latter deficiency. Despite the IJ's findings of "numerous instances where the government of Romania is willfully blind to severe mistreatment of Roma citizens by its own police," the BIA made no mention of the possibility of acquiescence through willful blindness.

Second, contrary to the majority's suggestion, the BIA's citation of *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001), tells us little. The BIA cited *Ali* for its recognition of the regulatory definition of "torture" pursuant to 8 C.F.R. § 1208.18(a)(1). To be sure, the *Ali* court noted later in its opinion, while interpreting "acquiescence," that the legislative history of § 1208.18(a)(7) suggests that "willful blindness" constitutes "acquiescence." 237 F.3d at 597. Had the BIA cited *Ali* for its definition of "acquiescence," we might surmise that the BIA had read to this later point in the *Ali* decision and had willful blindness in mind when it analyzed Nerghes's claim. But while interpreting "acquiescence," the BIA only cited *Matter of S-V-*, 22 I & N Dec. 1306, 1312 (BIA 2000), which contains the definition of "acquiescence" that is now "manifestly contrary to law." *Amir*, 467 F.3d at 927. The majority suggests that "the quoted language" from the BIA's decision is from the same paragraph in which the *Ali* court established that "acquiescence" includes "willful blindness." Majority Op. at 11. Yet the quoted language from 8 C.F.R. § 1208.18(a)(1) appears in a different paragraph, 30 lines (including a footnote) before the *Ali* court first mentions "willful blindness." 237 F.3d at 597. The majority's charitable reading of the BIA's reference to *Ali* seems unjustified.

Finally, the majority's suggestion that the BIA has sometimes erred more egregiously than it did in this case does not resolve whether remand is appropriate here. The majority is correct that the BIA need not recite the words "willful blindness" whenever "acquiescence of a public official" is at

issue. For example, we would not expect to see reference to the "willful blindness" standard when the issue was whether a perpetrator was a "public official." *See Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005) (concluding that IJ did not err in finding existence of a "*private* vendetta" rather than "acquiescence of a *public official*") (emphases added). But where acquiescence itself is at issue, we might expect, if not an explicit reference to the "willful blindness" standard, at least a clear indication that the BIA applied the correct standard. Here, the IJ specifically found acquiescence through "willful blind[ness]" by the Romanian Government. Yet, because the BIA reversed the IJ's CAT determination with no reference to the proper standard (and one citation to a dubious standard), we do not know whether the BIA also considered the "willful blindness" standard. The BIA's decision here, as judged by its own opinion, in my view just as likely derives from application of an improper standard as from application of a proper one.

For these reasons, I would remand to the BIA with instructions to analyze Nerghes's CAT application under the "willful blindness" standard.