**Cheryl VON HERBERT,**
**Plaintiff–Appellee,**

v.

**CITY OF ST. CLAIR SHORES; Officers Robert Chester, and Joe Chomiak, of St. Clair Shores Police Department, Defendants–Appellants.**

**No. 02–1063.**

United States Court of Appeals, Sixth Circuit.

March 11, 2003.

Before KRUPANSKY, SILER, and COLE, Circuit Judges.

SILER, Circuit Judge.

In this interlocutory appeal, Defendants Robert Chester and Joe Chomiak ("the Officers") appeal the district court's (1) denial of qualified immunity regarding unlawful arrest claims, and (2) denial of summary judgment with respect to equal protection claims. In the event that we reverse the unlawful arrest decision with respect to the Officers, Defendant City of St. Clair Shores ("the City") requests that we exercise pendent appellate jurisdiction and reverse the denial of summary judgment to the City. For the reasons stated below, we AFFIRM the denial of qualified immunity with respect to the unlawful arrest. Because we affirm the denial of qualified immunity with respect to the unlawful arrest, the City's request for pen-

dent appellate jurisdiction is moot. We do not have jurisdiction to consider the equal protection issue.

## I.

In 1998, Connie Floyd presented First Federal Bank ("the bank") with a fraudulent check made out to Elnora Pack and a driver's license in the same name. As Floyd waited at the drive-through window with two children in the back seat of her car, the bank called the St. Clair Shores Police Department. After the police arrived, the bank notified the police that an unidentified woman who sounded African–American had called the bank to ask what would happen to Floyd, the car, and the children. Based on this information and their experience with fraudulent check cashing, the Officers believed that (1) an accomplice was in the area and (2) the accomplice matched the photograph on Pack's drivers license. The Officers immediately began to search the area for Pack. Within minutes, Officer Chester located Plaintiff Cheryl Von Herbert ("Herbert") and asked her name, why she was at the mall, and for identification. Herbert answered these questions and produced a Michigan state identification card. After running a warrant/lien check on her, Chester returned the card and permitted Herbert to go on her way.

Chester then contacted Officer Chomiak and requested that he retrieve the Pack driver's license so that they could compare that driver's license with Herbert's face and ID. Chomiak soon returned and the Officers approached Herbert as she waited at the bus stop. Herbert reluctantly produced her ID for further examination. As the Officers were examining the two IDs, Herbert's bus arrived. When Chester waived the bus on, Herbert panicked. Herbert screamed loudly and demonstratively, both at the police and to onlookers

from whom she requested help from her perceived prosecutors. The Officers arrested Herbert for disorderly conduct and took her to the police station. At the police station, the Officers determined that Herbert and Pack were not the same person.

In Michigan state court, Herbert was prosecuted for disorderly conduct. The trial judge dismissed the charges, finding that the police "lacked an articulable reasonable suspicion to stop Herbert regarding an uttering and publishing incident." On appeal, the Michigan circuit court affirmed that the investigative stop and subsequent arrest were improper because (1) there was "no articulable reasonable suspicion that linked Herbert to the uttering and publishing charge." (2) there was "no reasonable evidence at the bank to suggest that two women had been involved in the crime of uttering and publishing," and (3) the telephone conversation "failed to provide a reasonable basis for assuming that the suspect had an accomplice or that Herbert was an accomplice."

Herbert then filed this action in federal court against the Officers and the City. Her complaint alleges a Fourth Amendment violation, an equal protection violation, and various state law claims. The district court denied all defendants summary judgment on the Fourth Amendment claim and denied the Officers summary judgment on the equal protection claim.

## II.

Review of the denial of qualified immunity is *de novo*. *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir.2002). As noted in *Risbridger*, "[a] district court's decision rejecting an individual defendant's claim to qualified immunity is immediately appealable to the extent that it raises a question of law, notwithstanding the absence of a final judgment." *Id.* at 568 (citing *Beh-*

*rens v. Pelletier*, 516 U.S. 299, 310–11, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

■ Although an immediate interlocutory appeal may be taken from an order denying a claim of qualified immunity, defendants generally cannot immediately appeal a denial of summary judgment when qualified immunity is not at issue. *See Archie v. Lanier*, 95 F.3d 438, 442–43 (6th Cir.1996). Therefore, this court does not have jurisdiction to review the district court's decisions on the equal protection claims, as qualified immunity was neither raised by defendants nor discussed by the district court with respect to those claims.

A qualified immunity analysis consists of two questions: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right; and (2) if a violation could be made out on a favorable view of the parties' submissions, was the right clearly established? *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

■ Following *Saucier*'s two-step procedure for determining qualified immunity, the court must first address whether, given the facts alleged by Herbert, the *Terry* stop was constitutionally valid.[1] In *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court for the first time approved use of a *Terry* stop "where police have been unable to locate a person suspected of involvement in a past crime." *Id.* at 229, 105 S.Ct. 675. In doing so, the Court noted that "[p]articularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible." *Id.*

■ Here, viewing the facts alleged in the light most favorable to Herbert, we find that the *Terry* stop in this case was unlawful. At the time of the *Terry* stop, the Officers were aware of the following facts: (1) Floyd had attempted to cash a fraudulent check, (2) during the police's detention of Floyd, the bank received an anonymous call inquiring about her status, (3) the bank employee who received the call believed it had been placed by a black woman, (4) the ID that Floyd had attempted to use identified a heavyset black woman, 5'4" tall, (5) Herbert was in the vicinity of the bank, (6) Herbert was a heavyset black woman, 5'4" tall, and (7) Herbert had produced an ID identifying her as Herbert (and not Pack). Given these facts, the Officers made the following inferences: (1) an accomplice was in the area, (2) the accomplice matched the photograph on Pack's drivers license, and (3) Herbert may have been the accomplice.

The third inference is problematic. Specifically, once Herbert produced her own ID, the police inquiry should have been

---

1. The district court did not conduct the first part of the qualified immunity analysis. Instead, it found that collateral estoppel mandates deference to the Michigan courts' determination that the Officers violated Herbert's Fourth Amendment rights. We disagree. Specifically, because the Officers were not party to or in privity with a party to the earlier action, collateral estoppel does not apply. *See Burda Brothers, Inc. v. Walsh*, 22 Fed.Appx. 423 (6th Cir.2001) ("[t]his court has [at least] twice rejected an attempt to use collateral estoppel offensively against a defendant officer in a § 1983 action because the officer was not party to or in privity with a party to the earlier action") (citing *Kegler v. City of Livonia*, No. 97–2206, 1999 WL 133110 (6th Cir. February 23, 1999); *Wallace v. Mamula*, No. 93–3603, 1994 WL 389197 (6th Cir. July 26, 1994)).

As collateral estoppel does not apply here, we review anew the question of whether a constitutional violation has occurred on the facts alleged.

satisfied. The Officers have never testified that they doubted the validity of the ID. There is no testimony that they examined the ID to see whether it was a fake, and the warrant/lien check on the ID had come up clean. Furthermore, (1) there was no exigency; (2) the crime at issue (uttering and publishing) did not involve any threat to public safety; and (3) the link connecting Herbert to the crime was tenuous even before Herbert produced her valid ID. *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), instructs that the suspect must be released once an officer determines the suspect's identity and obtains information dispelling the officer's suspicions. *Id.* at 439–40, 104 S.Ct. 3138.

■ Considering the alleged facts in the light most favorable to Herbert, we find that after the initial *Terry* stop, it was unreasonable for the Officers to continue to investigate Herbert to determine whether she was Pack. Because the *Terry* stop was unlawful, the arrest was also unlawful. Officers cannot arrest someone for exercising her right to resist an unlawful restraint. *See Darrah v. City of Oak Park,* 255 F.3d 301, 312 (6th Cir.2001) (noting that under Michigan law, arrestees have the right to use physical force to resist an unlawful arrest). No reasonable officer with knowledge of these alleged facts would believe that the stop or arrest was supported by the requisite reasonable articulable suspicion or probable cause. We therefore uphold the district court's denial

of qualified immunity to the Officers. Having found that Herbert has alleged sufficient facts to make out a constitutional violation, the City's request for pendent appellate jurisdiction is moot.

AFFIRMED.

KRUPANSKY, Circuit Judge, dissenting.

KRUPANSKY, Circuit Judge.

In this federal civil rights action for alleged wrongful arrest and racial profiling, the defendants-appellants Officers Robert Chester ("Chester") and Joe Chomiak ("Chomiak") (collectively "the officers" or "the individual defendants"). policemen for the defendant City of St. Clair Shores. Michigan ("the city"), via an interlocutory appeal anchored in the "qualified immunity" defense, have challenged the district court's denial of their motion for summary judgment. The plaintiff-appellee Cheryl Von Herbert ("Herbert" or "the plaintiff") alleged that the three defendants violated her liberties protected by the Fourth and Fourteenth Amendments to the federal constitution, as well as by Michigan law, during her investigative detention for suspicion of criminal activity and her subsequent arrest for breaching the peace. The panel majority's affirmance of the trial court's denial of the officers' qualified-immunity-based motion for final summary adjudication of the plaintiff's federal claims is legally erroneous.[1]

1. On review of any summary disposition, the appellate court, like the initial forum, examines *de novo* the entirety of the record evidence in the light most favorable to the party opposing summary judgment; it should resolve all credibility conflicts, and indulge all reasonable inferences supported by the evidence, in favor of that litigant. *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 556–57 n. 7 (6th

Cir.2000). However, the court should consider *all* record proof, not merely the evidence favorable to the non-moving adversary. Uncontradicted evidence which supports the movant's case, and the reasonable inferences derivable therefrom, could not be ignored by a rational jury at trial; thus the court should credit it to the summary judgment supplicant. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147

During the late morning of October 29, 1998, an African–American female later identified as Connie Floyd ("Floyd") attempted to negotiate a fraudulent check facially payable to "Elnora Pack" at the drive-through customer service window of the First Federal Bank in St. Clair Shores, Michigan ("the bank"). At that time, Floyd presented a Michigan driver's license issued in the name "Elnora Pack" which bore the photograph of an African–American woman who patently was not Floyd ("the Pack identification"). The bank promptly reported the crime to the St. Clair Shores police department. Responding officers arrived shortly thereafter. As they questioned Floyd, a bank clerk answered an outside telephone call from an unidentified person, whom the clerk believed to be an African–American woman. That caller inquired about the fate of Floyd, her automobile, and her two minor passengers.

The investigating policemen hypothesized, based upon their field experience with fraudulent check-cashing schemes, that the phoner probably was Floyd's accomplice; that she probably was the source of the Pack identification; that the likeness replicated on the Pack identifica-tion was probably hers; that she probably had observed the lawmen's arrival from a proximate distance; and that she probably was still lingering in the bank's vicinity. The Pack identification revealed that its subject was born in 1954 and stood 5'4" tall; its photograph depicted a round-faced African–American woman weighing considerably over two hundred pounds. Accordingly, the peace officers immediately scoured the financial institution's outer perimeter in search of an African–American woman whose physical appearance corresponded to the identification card's description and photograph of "Elnora Pack." Almost immediately upon commencing the area sweep, Officer Chester spotted the plaintiff Herbert, a middle-aged black female 5'4" in height, having a round face. and weighing in excess of 200 pounds, walking through a parking lot adjacent to the bank while carrying several laden shopping bags. The subsequent interactions between Herbert and the officers were recorded by a dashboard-mounted police video camera.

Chester briefly questioned Herbert through the window of his patrol cruiser. In response to his request, Herbert volun-

L.Ed.2d 105 (2000); *NLRB v. Garon,* 738 F.2d 140, 142 (6th Cir.1984). "The touchstone is whether the [total] evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Graham–Humphreys,* 209 F.3d at 557 n. 7 (brackets added; quotes and citations omitted).

A trial court's denial of qualified immunity is immediately appealable as long as no essential disputed issue of material fact remains for juror resolution *as a necessary predicate* to the final disposition of the qualified immunity defense. *See Johnson v. Jones,* 515 U.S. 304, 313–15, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). However, factual disputes will *not* deprive the reviewing court of interlocutory jurisdiction if the facts of record, when *construed most favorably for the plaintiff,* cannot, as a matter of law, carry the plaintiff's burden of disproving the defendant's presumptive entitlement to qualified immunity. *See, e.g., Mattox v. City of Forest Park,* 183 F.3d 515, 519 (6th Cir.1999); *Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir.1996). Stated differently, "[o]nly if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal." *Klein v. Long,* 275 F.3d 544, 549 (6th Cir.2001) (citations omitted), *cert. denied,* —— U.S. ——, 123 S.Ct. 95, 154 L.Ed.2d 26 (2002). Because the question whether qualified immunity should apply is ultimately an issue of law, the appellate court's examination is *de novo. Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir.2002).

tarily produced her Michigan state identification card, issued in the name "Cheryl Von Herbert," which reported her height (5'4"), her weight (240 lbs.), and her birth year (1956). She explained that she had been shopping, and was passing through the parking lot to reach a bus stop on the public street. Chester's computerized "warrant/lien search" of Herbert's official record disclosed no criminal past or pending charges. Accordingly, only seconds following their initial contact. Chester returned the plaintiff's identification card, thanked her for her cooperation, and permitted her to continue on her way. However, Chester continued to suspect that Herbert was Floyd's criminal cohort.

Shortly thereafter, Chester rendezvoused with defendant Chomiak in the parking lot. Following a brief discourse, Chomiak concurred with his colleague's assessment that Herbert likely was Floyd's at-large accomplice, and that their suspicions warranted further investigation. The officers agreed that Chomiak would retrieve the Pack identification card from the police station so that they could directly confront Herbert with it, and compare its portrait with the image reproduced on Herbert's state identification card. When Chomiak returned with the Pack driver's license, Herbert was still awaiting her bus at the mass transit stop. The two constables approached the suspect. One of the policemen displayed the Pack identification to her, and asked whether Elnora Pack was her twin sister. The plaintiff, with evident consternation, responded that she did not know that person. The investigators then requested to inspect her state identification card a second time. Herbert reluctantly complied, while expressing dissatisfaction with the further interrogation.

As the officers comparatively examined her identification card and the Pack driver's license, Herbert became increasingly agitated, erratic, and hostile. She dropped her bus ticket, excitedly proclaimed her ignorance of Pack, and expressed an irrational degree of distress about the prospect of missing her anticipated bus. Officer Chomiak advised the plaintiff to relax, and stated that she would be allowed to board her bus. However, when that public transit vehicle arrived moments later, Chomiak signaled its driver to depart without the plaintiff. As the motor coach exited the commuter embarkation zone, Herbert exploded into a hysterical panic, shrieking and wailing that she had done nothing wrong, did not know Pack, and absolutely must board the departing transport immediately. The officers' restrained and polite attempts to calm her merely aggravated Herbert's scene-creating outburst. When she began imploring bypassing pedestrians to rescue her from her predicament, the officers informed her that she was under arrest for disorderly conduct.

While the constables attempted to handcuff her, Herbert violently resisted by thrashing, flailing, and otherwise struggling to deflect or escape the officers' grasp, all the while alternating her anguished cries for mercy with pitiful screams for help. After several eventful minutes, the defendant officers managed to manacle their assailant and confine her within a squad car. The police dash-cam videotape revealed that, despite the plaintiff's initiation of a physical confrontation which menaced the personal safety of the patrolmen, they displayed the highest measure of courtesy, restraint, and professionalism in their actions towards the plaintiff, at all times executing only the minimal degree of force necessary to subdue her resistance to custodial arrest. Similarly, the defendants exhibited respect for the plaintiff's personal property by carefully securing her purse and recent

purchases inside their departmental vehicle.

Unfortunately, the officers did not know, and had no way of knowing, that Herbert suffered from diagnosed schizophrenia and periodic psychotic depression, as well as mild mental retardation. She had been institutionalized for psychiatric treatment during 1985, 1986, and 1996. For three months prior to the subject incident, she had been taking prescribed psychoactive medication thrice daily. Herbert's psychiatric evaluation related that the symptoms of her mental illness include constant agitation, irritability, an abusive and confrontational personality, irrationality, fragmented thought processes, limited judgmental ability, concentration difficulties, and a limited attention span. Consequently, the plaintiff frequently misinterpreted statements made to her and/or misunderstood situations which confronted her.

Following their arrival at the police headquarters, the individual defendants learned that Herbert in fact was not Elnora Pack; the actual Elnora Pack had reported the recent theft of her motor vehicle operator's permit. Nevertheless, given Herbert's disturbance of the peace, resistance of arrest, and physical assaults against police officers, the department elected to prosecute a state law disorderly conduct charge against her. However, within two hours of her arrest, the plaintiff's brother, a Detroit police officer, accepted the plaintiff's release to his custody. Ultimately, a Michigan trial judge dismissed the criminal charge against Herbert, which judgment was affirmed by the Michigan appellate court.

On October 27, 2000, Herbert instituted a civil rights action in federal court against the two arresting officers and their municipal employer, alleging, among other things, that the individual defendants had impinged (1) her Fourth Amendment protection against unreasonable seizure,[2] and (2) her Fourteenth Amendment "equal protection" privilege [3] against racially discriminatory targeting by law enforcement operatives commonly known as "racial profiling." *See* 42 U.S.C. § 1983 (outlawing, *inter alia*, the deprivation of any person's constitutional rights by individuals acting under color of state law). Following discovery, all three defendants sought summary judgment on each of the plaintiff's claims. On December 17, 2001, the district judge partially granted and partially denied that motion. Only the initial forum's rejection of the individual defendants' requests for summary judgment, as supported by the qualified immunity defense, against the plaintiff's Fourth and Fourteenth Amendment claims, are at issue on the instant review.[4]

A state or municipal officer may be sued under § 1983 in his or her individual ca-

---

**2.** The Fourth Amendment posits, in relevant portion, that "The right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated[.]" U.S. Const. amend. IV.

**3.** *See* U.S. Const. amend. XIV, § 1 (No State shall ... deny to any person within its jurisdiction the equal protection of the laws.").

**4.** Qualified immunity may foreclose only *individual capacity* lawsuits for damages against public agents. *See Harlow v. Fitzgerald,* 457 U.S. 800, 808, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Bass v. Robinson,* 167 F.3d 1041, 1051 (6th Cir.1999). By contrast, an *official capacity* damages action against a state or municipal officer is the equivalent of a damages liability litigation targeted against the public entity. *Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Hence, Herbert's official-capacity federal claims against Chester and Chomiak were redundant, because they were subsumed by her § 1983 charge against the city.

pacity for monetary damages if that individual, while acting under color of state law, had deprived the complainant of a federally protected right. *E.g. Goad v. Mitchell,* 297 F.3d 497, 501 (6th Cir.2002). However, state agents are insulated by the "qualified" or "good faith" immunity doctrine from exposure to "individual capacity" lawsuits anchored in a discretionary official decision if "their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known," even if their actions *actually violated* the plaintiff's federal rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (bracketed material added).

The qualified immunity bestowed upon state or municipal agents "sweeps broadly, affording them ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Scott v. Clay County, Tenn.,* 205 F.3d 867, 873–74 n. 9 (6th Cir. 2000) (citations and internal quotations omitted). Where applicable, that doctrine exonerates individual-capacity defendants not only from ultimate *liability* for their discretionary judgments, but further *excuses them from the rigors and expenses of defensive litigation. Id.* For that reason, the qualified immunity issue should be resolved at the *earliest possible practicable stage* of an individual-capacity lawsuit. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Goad,* 297 F.3d at 501. The defendant initially must raise the defense. *Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir.2002). However, because public workers are presumptively protected by the subject immunization, "[t]he ultimate burden of proof is on *the plaintiff* to show that the defendants are *not* entitled to qualified immunity." *Rich v. City of Mayfield Hts.,* 955 F.2d

1092, 1095 (6th Cir.1992) (emphases added; citation omitted).

In the litigation *sub judice,* the panel majority has *correctly* ruled that (1) interlocutory appellate jurisdiction is *proper* over the trial jurist's denial of qualified immunity to the officers on the plaintiff's Fourth Amendment unlawful seizure claim; (2) the criminal judgment in favor of the plaintiff in her Michigan disorderly conduct prosecution did *not* constitute collateral estoppel against the defendant officers in the case *instanter:* and (3) Officer Chester's initial momentary interrogation of Herbert in the parking lot was *lawful* under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I fully concur with those aspects of the panel's decision.

The panel majority, in accordance with standard practices, next assessed the merits of the qualified immunity defense, as applied to Herbert's Fourth Amendment unreasonable seizure claim, by initially examining the record evidence *de novo.* in the light most favorable to the plaintiff, to ascertain whether a reasonable jury could find that the officers' conduct infringed that right. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151 ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."). The panel majority has concluded that the record contains sufficient evidence to bolster a triable Fourth Amendment case. That resolution constituted legal error.

An official stop which restrains the suspect's ability to "walk away," no matter how brief and limited, constitutes an official "seizure" subject to Fourth Amendment "reasonableness" strictures. *Dela-*

*ware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The "reasonableness" determination hinges upon objective factors. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The Supreme Court, via *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny, has authorized brief investigative detentions by law enforcement professionals, if founded upon a "reasonable suspicion," supportable by articulable facts beyond a mere hunch, that the investigative target is, or was recently engaged in, or may soon engage in, criminal activity, if those objective facts would cause a police officer of reasonable prudence and caution to conclude that the investigative actions taken were warranted by the pertinent circumstances. *See United States v. Hensley,* 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Terry,* 392 U.S. at 20–22, 88 S.Ct. 1868.

Under *Terry,* "reasonable suspicion" is a fluid concept which balances the social interests supporting the temporary seizure against the implicated invasion of the detainee's personal liberty.[5] *Terry,* 392 U.S. at 20–22, 88 S.Ct. 1868. The Court has declined to fashion any *per se* rule restricting the permissible duration or conditions of a *Terry* investigative detention. *United States v. Sharpe,* 470 U.S. 675, 680, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Rather, the courts should conduct a "totality of the circumstances" inquiry in each case.[6]

**5.** Stated differently, "reasonable suspicion" is a common sense and nontechnical concept based on " 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quotation omitted). Reasonable suspicion requires "considerably less" proof than a preponderance, and is a standard "less demanding" than probable cause. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1990); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A reasonable suspicion may be based on facts and circumstances which might not arouse suspicion in a layperson, but which nonetheless are sufficient "only [for] someone experienced in law enforcement matters." *United States v. Garza,* 10 F.3d 1241, 1244 (6th Cir. 1993). Even a *mistaken* premise can justify a reasonable suspicion, if the officer's belief in that premise was reasonable and in good faith, and, if true, would authorize a *Terry* stop. *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 814 (6th Cir. 1999).

The historical facts and circumstances pertinent to the "reasonable suspicion" inquiry pose pure factual issues, whereas the ultimate "reasonable suspicion" query constitutes a mixed issue of law and fact. *See Ornelas v. United States,* 517 U.S. 690, 696–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Houston,* 174 F.3d at 813.

**6.** *See also United States v. Place,* 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.").

The panel majority has cited *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), in support of its conclusion that the individual defendants' second *Terry* stop was unwarranted because Herbert was not suspected of a crime which threatened the public safety. However, *Hensley* did not rule that *only* physically dangerous suspects may be stopped and questioned under *Terry.* To the contrary, the *Hensley* Court instructed that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* at 229. The Court merely remarked that a *Terry* stop may be especially appropriate when the target is suspected of having committed a crime which identifies the perpetrator as a potential menace to the bodily security of local citizens. *Id.* Accordingly, the implicated law enforcement and public safety interests in such cases may justify a lengthier

*United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The initial *Terry* query is "whether the officer's action was justified at its inception." *Terry*, 392 U.S. at 19, 88 S.Ct. 1868. The second inquiry is "whether the detention was reasonably related in scope to the circumstances that justified the interference in the first place." *Id.* "The scope of the detention must be narrowly tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

The operative facts in the instant case do not support the panel majority's ultimate conclusion that Herbert produced sufficient evidence to support a triable *Terry* cause of action. To avoid summary judgment on her *Terry* claim, the plaintiff needed to proffer sufficient evidence which, if credited by a hypothetical rational jury, would prove that no hypothetical experienced reasonable law enforcement official would have deemed her further interrogation at the mass transit stop to have been justifiable. The panel majority so concluded: "Considering the alleged facts in the light most favorable to Herbert, we find that after the initial *Terry* stop, it was unreasonable for the Officers to continue to investigate Herbert to determine whether she was Pack. Because

the *Terry* stop was unlawful, the arrest was also unlawful." Majority Opinion, at page 5.

However, to the contrary, construction of the record proof from the perspective most favorable to Herbert simply does *not*, as a matter of logic, *compel* the conclusion that Herbert and Pack were not the same person simply because Herbert had produced a valid state identification card which had been issued in her proper name, and/or because an electronic search of her police record disclosed no prior offenses or pending charges. Those facts, when construed most favorably for the plaintiff, proved only that the plaintiff's real name was Cheryl Von Herbert: that she possessed a valid state identification card; and that prior to October 29, 1998, she had managed to avoid acquiring a criminal record. However, in the context of the total circumstances described herein, a rational investigating officer could nonetheless conclude that a reasonable possibility remained that Herbert nonetheless was the individual depicted on the purported driver's license ostensibly issued to Elnora Pack, which had been proximately used by Floyd in her attempt to negotiate a fraudulent instrument, thereby justifying a second, continued, or renewed *Terry* investigation of reasonable scope.[7] *See Ohio v.*

and/or more intrusive *Terry* stop than would suspicion of a mere non-violent misdemeanor; nevertheless, nothing in *Hensley* or any other authority invoked by the panel majority suggests that an exceedingly brief and non-intrusive *Terry* stop, such as the one at issue herein, is improper simply because the investigators suspected the subject of having committed only a non-violent felony.

7.  The panel majority's citation to *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), in support of the proposition that "the suspect must be released once an officer determines the suspect's identity and obtains information dispelling the officer's suspicions" was inapposite.

Majority Opinion, at page 5. In *Berkemer,* the Supreme Court commented that, during a typical roadside traffic stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439, 104 S.Ct. 3138. If that questioning does not lead to information supporting probable cause for arrest, the detainee must be released. *Id.* at 439–40, 104 S.Ct. 3138. However, nothing in *Berkemer* suggested either (1) that mere evidence of a suspect's actual identity is conclusive proof that she is *not* the person pictured on an identification card issued in a different name which had been used in an attempt bank fraud, or (2) that all of the objectively

*Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (expounding that the "touchstone of the Fourth Amendment is reasonableness.") (*quoting Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

Accordingly, as evolved herein, the plaintiff could not, as a matter of law, carry her burden of proving that any portion or aspect of the defendants' *Terry* investigation was unreasonable. The officers' second interrogation of the plaintiff had been initiated for the patently proper purposes of questioning Herbert about the Pack identification, and directly comparing it with Herbert's Michigan identification card. The officers had barely commenced that *Terry* inquiry when, only seconds into that interaction, the plaintiff embarked upon a pattern of extreme misbehavior which the officers deemed to constitute disorderly conduct, which incited her lawful arrest, as developed herein. Hence, the individual defendants' second *Terry* investigative detention of Herbert did not exceed the bounds of the law.

Turning to the scrutiny of Herbert's *arrest* during her second *Terry* interrogation, the appropriate point of departure is the rule that, absent any predicate *Terry* transgression, a section 1983 "wrongful arrest" claimant must prove that the arresting officers lacked *probable cause* to believe that she had committed the charged crime. *Stemler v. City of Florence,* 126 F.3d 856, 871 (6th Cir.1997). If, during the course of a legitimate *Terry* stop, the suspect's words or deeds supply the interrogating patrolmen with "probable cause," her consequent arrest is constitutionally valid. *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317

(1984). "Probable cause" denotes "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988) (*quoting Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant." *Criss,* 867 F.2d at 262. Probable cause is a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993) (en banc). That doctrine provides a flexible, common-sense standard which implicates merely a *probability* or *substantial chance* that conduct has occurred which is criminally punishable; it does not require actual "beyond-a-reasonable-doubt" proof of culpable activity. *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause is assessed vis-a-vis the totality of the circumstances, which "analysis includes a realistic assessment of the situation from a law enforcement officer's perspective." *Ferguson,* 8 F.3d at 392 (citations omitted)

In the action *instanter,* the officers arrested Herbert for disorderly conduct only after she had created a considerable disturbance of the public peace by loudly and vigorously shrieking, wailing, moaning, thrashing, pleading for leniency, begging civilian pedestrians to assist her escape, and struggling against the constables.[8]

---

reasonable material suspicions of an investigating peace officer concerning an individual in Herbert's circumstances should be dis-

pelled merely by the suspect's production of a valid identification card.

**8.** The trial court *incorrectly* concluded that the officers had arrested Herbert at the mo-

Herbert's ultimate acquittal of that criminal charge is immaterial to the question whether, given the circumstances posed at the time of her arrest, an objectively reasonable law enforcement agent could have concluded that the target probably had committed the crime of disorderly conduct. *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). In my opinion, the subject record proves beyond any rational dispute that Officers Chomiak and Chester had probable cause to arrest Herbert for disorderly conduct. Therefore, even after construing the record evidence most favorably for the plaintiff, she could not prove at trial that the individual defendants violated her Fourth Amendment rights against unreasonable seizure. Hence, the individual defendants are entitled to pre-trial summary judgment on that cause of action, because, at trial, the plaintiff will be unable to muster sufficient evidence to disprove the officers' entitlement to the "good faith" immunity defense.

Furthermore, because final summary disposition should be awarded to the two

individual defendants on the plaintiff's Fourth Amendment claim on the rationale that the record evidence, even as construed most favorably for the plaintiff, could not sustain verdicts against those defendants, I would further exercise discretionary pendent party jurisdiction over their municipal employer, thereby enabling the entry of final judgment in its favor as well on the Fourth Amendment cause of action. *See Scott v. Clay County, Tenn.*, 205 F.3d 867, 879–80 (6th Cir.2000); *Brennan v. Township of Northville*, 78 F.3d 1152, 1157–58 (6th Cir.1996). That result would conserve the resources of both the courts and the litigants, as well as promote the earliest possible final resolution of a misconceived controversy, because, as a matter of law, a § 1983 municipal defendant cannot be liable in damages for any faulted action undertaken by its agent(s) which did not inflict any constitutional tort. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

Alternatively, even assuming *arguendo* that a rational jury could arguably find on

ment that they prevented her from boarding her intended bus. That vehicle's departure *preceded* Herbert's arrest-provoking disorderly conduct, in that her severe peace-disturbing actions were apparently driven by her anxiety caused by missing that bus. The record elicited that, at that instant, the officers were still engaged in a lawful *Terry* investigation of Herbert's possible relationship to the Pack identification card; they had approached her with that card only seconds prior to the bus' arrival. Consequently, they had not yet had sufficient time to complete a meaningful *Terry* inquest of reasonable scope and duration. Preventing the detainee from boarding a bus during a reasonable *Terry* interrogation did not constitute an unreasonable seizure under the circumstances because, if the *Terry* stop had ultimately proved fruitless, she would have been at liberty to board the next appropriate bus. The plaintiff has not evidenced that the interval separating the subject bus' departure from the scheduled arrival of the next bus that would cover the same relevant municipal transit route would

have imposed any significant hardship upon her. Moreover, contrary to the plaintiff's contention, the mere existence of hypothetical investigative alternatives to disallowing the plaintiff's embarkation on the bus, such as the facially inferior and arguably unlawful option of detaining the municipal transport and all of its passengers until the completion of a proper *Terry* investigation, or the manifestly impractical alternative of reliance upon the officers' ability to instantaneously memorize the data stated on Herbert's Michigan identification card while permitting her to immediately board the departing bus, does not detract from the propriety of an overall objectively reasonable *Terry* stop. *See United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("the Court should not indulge in unrealistic second-guessing. . . . The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.") (citations omitted).

the total evidence that the individual defendants' actions had actually invaded the plaintiff's Fourth Amendment immunities (which is not the case herein), Herbert could not demonstrate, as a matter of law, that any "clearly established" federal authority defining the illegality of that official conduct existed on or before October 29, 1998, such that objective reasonable officers in the posture of Chester and Chomiak should have known that their conduct transgressed the plaintiff's Fourth Amendment protections. *See Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994); *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. If officers of "reasonable competence" could disagree about the permissibility of the faulted actions under pre-existing law, immunity should be accorded. *Malley v. Briggs*, 475 U.S. 335, 341, 349, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1987).

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... *but it is to say that in the light of pre-existing law the unlawfulness must be apparent.*" *Painter v. Robertson*, 185 F.3d 557, 571 n. 20 (6th Cir.1999) (emphasis

added) (*quoting Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). *See also Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2516–17, 153 L.Ed.2d 666 (2002); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir.2002). "In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (citation omitted).

In the action in controversy, neither the panel majority nor the plaintiff has cited a single judicial precedent, from *any* court, which could be rationally construed to notify an objectively reasonable lawman that the assailed *Terry* investigation for suspicion of complicity to defraud a financial institution, and/or the arrest for disorderly conduct, at issue in the present case, were unlawful. To the contrary, Officers Chomiak and Chester should be commended for their diligence and professionalism in executing a thorough, and in all particulars constitutionally reasonable, investigation of a legitimate bank fraud suspect who ultimately proved to be a challenging target, as well as in effecting her arrest for disorderly conduct. Undoubtedly, many competent law enforcement professionals would not only have concluded that the individual defendants' actions did not offend the Fourth Amendment, but that to have taken any lesser measures would have constituted dereliction of their sworn duty to uphold and enforce the criminal law.[9] *Cf. Pierson v. Ray*, 386 U.S. 547,

9. In affirming Herbert's acquittal of the disorderly conduct charge, the Michigan appellate court remarked that "[e]ven the prosecution admitted that Herbert just happened to be in the wrong place at the wrong time." The *plaintiff has repeatedly touted that comment* during the course of the subject civil rights litigation. However, whereas that unfortunate truth may have supported Herbert's criminal acquittal, it provided the strongest possible support for the insulation of the defendant officers from civil liability, in that objectively reasonable officers confronted with the facts of this case could not have known that Herbert was merely an innocent victim of circumstances.

555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause [or does not investigate when he has a reasonable suspicion], and being mulcted in damages if he does.") (brackets added).

Respecting the plaintiff's second federal civil rights theory, namely "racial profiling" in offense to Fourteenth Amendment equal protection strictures, the district court awarded summary judgment to the city; [10] but denied it to the individual defendants on the rationale that Herbert had supplied sufficient evidence to create a triable "racial profiling" case against them. In so ruling, the district court performed no "clearly established law" analysis, because, on summary judgment, the defendants had exclusively argued that the plaintiff had offered no colorable evidence of "racial profiling;" they failed to explicitly mount the second stage of the qualified immunity defense against that particular charge. *See Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151 (instructing that the qualified immunity defense consists of a dual inquiry, a negative response to either of which compels summary judgment for a defendant public servant; those questions are (1) whether the record evidence, when construed most favorably for the plaintiff, could support a finding that a federal rights violation had occurred, and (2) *if so,* whether the controlling federal law was clearly established at the time of the averred infraction).

Nevertheless, in their opening appellants' brief, heading IV, the officers articulated: "Upon A De Novo Review *The Denial Of Qualified Immunity To The Officers On Plaintiff's Equal Protection Claim Was Erroneous* When Plaintiff Failed To State A Claim And/Or Establish There Was A Genuine Issue of Material Fact For Trial." (Emphases added). Additionally, although the individual defendants' supporting argument focused upon the absence of record proof corroborative of the racial profiling allegation, their opening brief also posited that, in light of the absence of colorable evidence, "[t]he District Court's decision [denying summary judgment on the racial profiling charge] is clearly contrary to existing law."

Nonetheless, the instant panel majority has opined that "this court does not have jurisdiction to review the district court's decisions on the equal protection claims, as qualified immunity was neither raised by the defendants nor discussed by the district court with respect to those claims." Majority Opinion, at pages 3–4. That resolution constituted legal error.

As examined herein, the bipartite qualified immunity defense supplies a state or municipal agent with dichotomus separate, and equally dispositive, potential shields to civil damages liability. During the district court proceedings, the defendant officers expressly asserted only the *first* of those two immunities—namely that the record evidence, even as construed most favorably for the plaintiff, could not sustain a triable claim of racial profiling. Nonetheless, unavoidably implicit in that argument was the contention that federal law did not support the charge that the officers' alleged conduct comprised unlawful racial profiling. Next, the district court, by ruling that the plaintiff had supplied adequate evidence to create a triable racial profiling case against the officers, subordinately posited that the plaintiff's evidence as con-

10. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (creating special requirements for municipal liability in § 1983 civil damages actions); *Scott v. Clay County, Tenn.,* 205 F.3d 867, 879 n. 21 (6th Cir.2000).

strued most favorably for her, matched with governing federal law, supported a colorable racial profiling claim. Ultimately, via an interlocutory appeal, the individual defendants attacked, by proper invocation of the "qualified immunity" rubric, the district court's legal conclusion that the record evidence, paired with established federal law, could be construed to buttress a viable racial profiling cause of action. Accordingly, the officers did *not* fail to preserve, for interlocutory appellate scrutiny, their qualified immunity defense against Herbert's Fourteenth Amendment racial profiling accusation.[11]

At bottom, neither the facts nor the law supported Herbert's charge of racial pro-

**11.** The panel majority cited *Archie v. Lanier*, 95 F.3d 438 (6th Cir.1996), as its sole authority supporting its directive that the circuit court lacks jurisdiction to consider Chester's and Chomiak's qualified immunity defense against the racial profiling charge. However, to the contrary, *Archie* illustrates why appellate jurisdiction in the case at bench is proper. In *Archie,* the defendant David Lanier, a county judge, had, in the trial court, unsuccessfully asserted judicial immunity against a litigant's claim that he had abused his judicial privileges to stalk and sexually harass her, in violation of her federal civil rights. On interlocutory review, the Sixth Circuit pronounced that the district court's disallowance of judicial immunity was correct, because the plaintiff's factual allegations did not implicate "judicial acts;" hence her claims fit into a legal category not amenable to judicial immunization. *Id.* at 440–41. Next, Judge Lanier alternatively attacked the district court's partial denial of his motion to dismiss the plaintiff's civil rights complaint. The circuit court ruled *sua sponte* that it lacked interlocutory appellate jurisdiction to assess the alleged demerits of the plaintiff's complaint, because interlocutory jurisdiction existed only over the asserted judicial immunity defense, whereas the substantive merits of the plaintiff's claims were neither "inextricably intertwined" with the judicial immunity issue, nor did a meaningful review of the denial of judicial immunity compel review of the partial denial of the defense motion to dismiss the complaint. *Id.* at 441–43.

By contrast, in the cause *sub judice,* the officers' unsuccessful attack in the district court against the legal sufficiency of the record evidence in support of Herbert's racial profiling claim was "inextricably intertwined" with the qualified immunity defense, because, as developed herein, that assault is the precise equivalent of the first of the two qualified immunizations. Consequently, appellate jurisdiction over the first qualified immunity the-

ory is incontrovertibly proper. Furthermore, appellate jurisdiction over the second qualified immunity rationale, *videlicet* that even if a potential racial profiling transgression had occurred, the officers are nonetheless exempted from civil liability, because the defining law was not clearly established at the relevant time, is also proper, because the state of the law, including as it existed on the day of the policemen's criticized actions, is an issue "inextricably intertwined" with an assessment of the legal sufficiency of the plaintiff's supporting proof; stated differently, no meaningful review of the legal sufficiency of the plaintiff's proof can be conducted absent an examination of the controlling law.

In any event, even if Chester and Chomiak had, in the lower court, entirely neglected to preserve *any* qualified immunity defense vis a vis Herbert's racial profiling count, the circuit court could, in its discretion, excuse that default, thus permitting it to resolve at the present time the strictly legal issue of the application of qualified immunity to the Fourteenth Amendment racial profiling charge. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Foster v. Barilow,* 6 F.3d 405, 407 (6th Cir.1993); *In re Allied Supermarkets, Inc.,* 951 F.2d 718, 725–26 (6th Cir.1991). Given this reviewing court's undisputed and unquestionable interlocutory jurisdiction over the officer's qualified immunity defense against Herbert's Fourth Amendment claim, the jurisprudential preference for resolving qualified immunity claims at the litigation's earliest practicable stage, and the legal propriety of the qualified immunity defense against the racial profiling claim on the subject record, as elicited herein, I would sustain the individual defendant's qualified immunization against the plaintiff's racial profiling claim at this time irrespective of any forfeiture of that issue which those defendants may have committed in the district court.

filing.[12] The targeting of a criminal suspect solely by reference to the subject's race violates the constitution. *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The basic premise of the Equal Protection Clause is that all similarly situated persons should be treated alike by state actors. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). An alleged victim must prove by "direct, circumstantial, or statistical evidence, that he [or she] was a target of racial profiling." *United States v. Saucedo,* 226 F.3d 782, 790 (6th Cir. 2000) (brackets added), *cert. denied,* 531 U.S. 1102, 121 S.Ct. 838, 148 L.Ed.2d 718 (2001). Mere speculation that police operatives had selected a suspect because of racial bias is inadequate to support a racial profiling charge.[13] *Id.* Moreover, the selection of an African–American suspect for questioning "because his clothing, appearance, location, and race coincided with published descriptions" patently does not comprise "illegal 'racial targeting' or 'racial profiling.'" *United States v. Waldon,* 206 F.3d 597, 604 (6th Cir.2000) (further asserting that "[c]ommon sense dictates that, when determining whom to approach as a suspect of criminal wrongdoing, a police officer may legitimately consider race as a factor if descriptions of the perpetrator known to the officer include race.").

In the case *instanter,* Chomiak and Chester selected Herbert for questioning because all of the objective evidence available to them indicated that, if Floyd had an accomplice within the bank's vicinity, she very likely resembled the person photographed and described on the Pack driver's license. That person objectively resembled Herbert in gender, age, height, weight, facial characteristics, and race. Accordingly, the record evidence, when construed most favorably for Herbert, reflected only that the officers targeted her for interrogation because of her objective similarities to the "published description" of Floyd's suspected partner in crime. Not even a scintilla of proof suggested that Chester or Chomiak had acted upon, or had been predisposed towards, any racially-animated abstract negative stereotypic presuppositions about the criminal tendencies of African–Americans as a class.[14]

---

**12.** The district court failed to cite even a solitary "racial profiling" precedent in support of its denial of the officers' petition for a favorable summary adjudication of that claim.

**13.** *See also Chappell v. GTE Products Corp.,* 803 F.2d 261, 268 (6th Cir.1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age [or race] discrimination."). (Citation omitted).

**14.** The trial jurist's syllogism that, because Chester had briefly spoken with a male African–American pedestrian prior to interrogating Herbert, therefore he must have targeted black suspects because of their color irrespective of their dissimilarities to the person depicted on the Pack identification card, was ill formulated. Construing that evidentiary fragment most favorably for Herbert can prove only that Chester had talked momentarily with a nearby pedestrian, who happened to be a male of African–American extraction, about an unknown subject. No evidence revealed any investigatory pattern by Chester involving the questioning of every African–American in the vicinity; nor that Chester had deliberately bypassed any person of any other race prior to conversing with the black male; or even that Chester had deemed the male pedestrian a criminal suspect or had spoken to him in connection with the subject criminal investigation. To the contrary, the pedestrian may have flagged the police officer to ask for directions; or Chester may have merely asked the man if he had seen a short, middle-aged, heavy-set, round-faced, African–American woman lurking in the area. At bottom, nothing but impermissible speculation and conjecture could support a jury finding that, simply because Chester had conversed for a few seconds with a male African–American pedestrian prior to interrogating Herbert, that he was targeting black citizens as potential culprits solely by reason of their racial origins.

Hence, the officers are entitled to "good faith" immunization against Herbert's Fourteenth Amendment racial profiling claim, and therefore summary judgment should be awarded to them on that cause of action.

Accordingly, I would reverse the district court's denial of summary judgment for all three defendants on the plaintiff's Fourth Amendment claims, and for defendants Chomiak and Chester on the plaintiff's Fourteenth Amendment cause of action, and remand with instructions to enter final judgment in favor of all defendants on both the plaintiff's "unreasonable seizure" and "racial profiling" federal civil rights claims, and for such further necessary and appropriate proceedings as are consistent with this opinion. I dissent.